# In the United States Court of Federal Claims

No. 15-1290C

(Filed Under Seal: February 26, 2016)
(Reissued: March 7, 2016)

| | |
|---|---|
| **INNOVATIVE TEST ASSET SOLUTIONS LLC,** | Post-award bid protest; agency's reevaluation as part of GAO's recommended corrective action; implied duty to fairly and honestly consider protestor's proposal during reevaluation; technical risk factors; cost-price considerations, including price realism; past performance |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **NATIONAL AEROSPACE SOLUTIONS, LLC,** | |
| **Defendant-Intervenor.** | |

Robert J. Symon, Bradley Arant Boult Cummings LLP, Washington, D.C. for plaintiff. With him on the briefs and at the hearing were Elizabeth A. Ferrell and Aron C. Beezley, Bradley Arant Boult Cummings LLP, Washington, D.C.

Peter A. Gwynne, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With Mr. Gwynne on the briefs and at the hearing was Gregory B. Porter, United States Air Force. Also with him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well as Lt. Col. Mark E. Allen, Lt. Col. Damund E. Williams, Maj. Daniel J. Watson, and Maj. George M. Ebert, United States Air Force.

Michael F. Mason, Hogan Lovells US LLP, Washington, D.C. for defendant-intervenor. With him on the briefs and at the hearing were C. Peter Dungan and Christine Reynolds, Hogan Lovells US LLP, Washington, D.C.

## OPINION AND ORDER[1]

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the United States Court of

LETTOW, Judge.

  This post-award bid protest arises from a solicitation by the United States Air Force ("Air Force" or "government") for test operations and sustainment services at the Arnold Engineering Development Complex located near Tullahoma, Tennessee.  On June 10, 2015, after an approximately ten-month procurement process, the Air Force awarded the contract to National Aerospace Solutions, LLC ("National Aerospace").  Another offeror, Innovative Test Asset Solutions LLC ("Innovative Test"), initially protested this award at the Government Accountability Office ("GAO"), challenging several aspects of the Air Force's evaluation process.  GAO sustained the protest on two grounds related to the technical evaluation of Innovative Test's proposal and recommended that the Air Force take corrective action.  The Air Force conducted a limited reevaluation of the offerors' original proposals and issued a new selection decision on November 18, 2015, maintaining the award to National Aerospace.

  Innovative Test now seeks a permanent injunction in this court of the award to National Aerospace, asserting that the Air Force breached its duty to honestly and fairly consider Innovative Test's proposal during the reevaluation, as well as renewing several of its protests regarding alleged flaws in the evaluation process.  Pending before the court are the parties' cross-motions for judgment upon the administrative record.  For the reasons discussed in this opinion, the court has concluded that the plaintiff's motion should be denied and the government's and defendant-intervenor's motions should be granted.

**FACTS**[2]

A.  *History of the Arnold Engineering Development Complex*

  The Arnold Engineering Development Complex was established in 1951 in the Tennessee Valley to serve as the Air Force's premiere aerospace engineering development

---

Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information.  The resulting redactions are shown by brackets enclosing asterisks, as "[***]."

  [2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), as well as from the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] court, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief." (quoting *PGBA, LLC v. United States*, 60 Fed. 567, 568 n.1, *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004))).

center.  Pl.'s Mem. in Support of Its Mot. for Permanent Injunctive Relief, Declaratory Relief and Judgment on the Admin. Record ("Pl.'s Mot.") at 3, ECF No. 50 (citing *The History of AEDC*, United States Air Force, http://www.arnold.af.mil/shared/media/document/AFD-110405-006.pdf).  The complex "operates 32 aerodynamic and propulsion wind tunnels, rocket and turbine engine test cells, space environmental chambers, arc heaters, ballistic ranges and other specialized units."  *Id.*  In the 1960s, the complex focused on support to the U.S. space program, conducting tests on space propulsion systems.  *Id.* at 4 (citing *Aerospace, Excelled: The USA's Arnold Engineering Development Center* ("*Aerospace, Excelled*"), http://www.defense industrydaily.com/atas-consolidated-contract-for-maintenance-support-of-arnold-engineering-development-center-0627/).  The focus later shifted to development of military aircraft, including testing for the F-15, F-16, and F-111 fighter aircraft.  *Id.*  The complex currently conducts aerodynamics and propulsion development tests for programs such as the F-22, F-35 Joint Strike Fighter, and F-18 E/F fighter aircraft, and the Delta III and IV rockets.  *Id.*

Throughout the history of the Arnold Engineering Development Complex, the Air Force has relied on contractors to support the operations and maintenance of the test facilities, and to assist with information management and base operations.  AR 132-27898; Pl.'s Mot. at 4 (citing *Aerospace, Excelled*).[3]  Initially the services were provided by a single contractor, but in 1980 the Air Force changed its acquisition strategy "[t]o stimulate competition and strengthen Air Force control of the Complex's . . . operations."  AR 132-27898.  At that time, the Air Force awarded three separate contracts for propulsion testing, flight dynamics, and mission support.  AR 132-27898.  In 2003, these services were again consolidated into one contract known as Operations, Maintenance, Information Management, and Support ("OMIMS").  AR 132-27899; Pl.'s Mot. at 4.  The OMIMS contract was awarded to Aerospace Testing Alliance ("ATA"), a joint venture between Jacobs Technology Inc. ("Jacobs"), Computer Sciences Corporation, and General Physics.  AR 132-27899, -928.[4]  The contract extended for 12 years and was awarded for a price of $2.75 billion.  Pl.'s Mot. at 4.

B.  *Solicitation for a New Test Operations and Sustainment Services Contract*

In January 2013, the Air Force established a Source Selection Office to develop an acquisition strategy to again divide the OMIMS contract, this time into six distinct contracts, the largest of which (Test Operations and Sustainment) is at issue in this case.  AR 132-27899 to -

[3]Citations to the administrative record refer to the record as filed and amended.  The record is paginated sequentially and is also divided into tabs.  In citing to the administrative record, the court will first designate the tab, followed by page number, e.g., AR 132–27898 refers to page 27898, which is located in tab 132 of the record.

[4]Jacobs had historically provided testing and base operations services at the Arnold Engineering Development Complex through its predecessor organizations, Jacobs Sverdrup and Sverdrup Technology, Inc.  AR 132-27899; *see also* Pl.'s Mot. at 4 & n.5.  Computer Sciences Corporation sold the area of its business covered by the OMIMS contract to Pacific Architects and Engineers ("PAE") in 2013.  AR 132-27899.  General Physics became GP Strategies Corporation ("GP Strategies") during the course of the OMIMS contract.  *See, e.g.*, Pl.'s Mot. at 54 (noting that as of 2013, GP Strategies was a partner in ATA, along with Jacobs and PAE).

900.  The government publically announced its plans for the Test Operations and Sustainment contract in February 2013.  AR 1-14.  The Air Force issued a series of requests for information through the Federal Business Opportunities website to assess potential offerors' capabilities and interests in the work to be performed and to obtain their reactions to possible contracting approaches.  AR 1-2 to -20; *see also* AR 10-7364 to -66.  Over the next several months, the Air Force also trained personnel who would be involved in the source selection process, including those who would be responsible for acquisition planning, past performance evaluation, risk management, and drafting instructions to offerors and evaluation criteria.  AR Tabs 2-3, 6, 8.  In October 2013, the Air Force received an independent government cost estimate totaling approximately $1.8 billion for the anticipated work to be performed over an eight-year period.  AR 9-7343.  The government also obtained a market research report, which concluded that the Test Operations and Sustainment contract should be awarded through a full and open competition because of the "limited number of companies with the capabilities to manage and execute the broad and diverse requirements of the proposed . . . contract."  AR 10-7396.

The Air Force issued a request for proposals ("RFP") for the Test Operations and Sustainment contract (solicitation number FA9101-13-R-0100) on August 28, 2014.  AR Tab 35.  The RFP stated that it was an unrestricted procurement for the services at Arnold Engineering Development Complex, as well as two remote testing sites in White Oak, Maryland and Moffett Field, California.  AR 35-14226, -14239.  The solicitation contemplated a firm-fixed-price phase-in period from July 1, 2015 to September 30, 2015, a cost-plus-award-fee base period from October 1, 2015 to September 30, 2016, and seven one-year option periods for fiscal years 2017 to 2023.  AR 35-14228 to -35.[5]  The performance work statement attached to the RFP indicated that the solicitation was intended to "obtain the technical expertise and services necessary to support" the complex's mission, and it advised that because of certain fiscal constraints, "near term efficiencies will be necessary to allow continued operation of required capabilities."  AR 35-14296.  The specific contract services included "test operations, technology development, equipment and facility sustainment, capital improvements and some support services."  AR 35-14297.

The evaluation criteria section of the RFP (Section M) stated that the government would conduct a "best value source selection" to determine the "best overall offer, based upon an integrated assessment of [the] [t]echnical, [p]ast [p]erformance, and [c]ost[-p]rice [evaluation factors]."  AR 35-14474.[6]  The technical and past performance factors, when taken together, were to be "significantly more important" than the cost-price factor, although cost-price would "contribute substantially to the selection decision."  AR 35-14475.  The RFP stated that this evaluation approach "may result in an award to a higher rated, higher priced offeror, where the decision is consistent with the evaluation factors, and the Source Selection Authority . . . reasonably determines that the technical and/or overall business approach and/or past

_____

[5]Two of the contract option periods were intended to serve as award terms based on the awardee's performance evaluations during the course of the contract.  AR 35-14254 to -55.

[6]The evaluation criteria reflect amendments to the RFP issued on September 12, 2014, September 18, 2014, and September 24, 2014.  *See* AR 29-14088 to -14178 (providing the three amendments).

performance of the higher price[d] offeror outweighs the cost difference." AR 35-14474. It also stated that discussions would be held with offerors to aid the government in obtaining the best value, and that offerors' responses to evaluation notices and their final proposal revisions would be considered in making the source selection. AR 35-14475.

### 1. *The technical evaluation factor.*

Within the technical evaluation factor, the RFP outlined four subfactors that would be given equal weight: (1) Technical Operations, (2) Management Approach, (3) Qualified Personnel, and (4) Innovations and Efficiencies. AR 35-14475. The Technical Operations subfactor involved an assessment of the offerors' approach to the requirements outlined in a performance work statement, based on four measures of merit: (1) operation of test and test support assets, (2) integrated scheduling, (3) lifecycle sustainment, and (4) capital improvements. AR 35-14477 to -78. The Management Approach subfactor involved evaluating the offerors' "ability to implement an effective and efficient management approach that incorporates risk management into all aspects of the approach." AR 35-14478. The evaluation of this subfactor would be based on six measures of merit: (1) performance measurement, (2) interface management, (3) workload management, (4) transition/phase-in management, (5) subcontracting management, and (6) organizational conflict of interest. AR 35-14478 to -79. The Qualified Personnel subfactor would assess the experience and capabilities of the proposed personnel, based on the individuals identified and the overall staffing plan. AR 35-14479. Finally, the Innovations and Efficiencies subfactor would assess offerors' proposed methods of creating "measurable savings" over the initial government cost estimate or "qualitative improvements" to the requirements in the performance work statement. AR 35-14480.

The evaluation of each technical subfactor would be stated in terms of "two distinct but related assessments: the Technical Rating and the Technical Risk Rating." AR 35-14475. The Technical Rating would assess "the quality of the offeror's solution for meeting the [g]overnment's requirement[s]," and each offeror would receive one of five adjectival ratings: Blue/Outstanding, Purple/Good, Green/Acceptable, Yellow/Marginal, and Red/Unacceptable. AR 35-14475 to -76. The government reserved the right to give positive consideration ("assign a strength") to offerors who exceeded the threshold requirements of any of the technical subfactors. AR 35-14476. The Technical Risk Rating, by contrast, was intended to assess weaknesses within the offerors' proposals, including the "potential for disruption of schedule, increased costs, or degradation of performance, the need for increased [g]overnment oversight, or the likelihood of unsuccessful contract performance." AR 35-14476. Each offeror would receive one of three adjectival ratings based on this assessment: Low (the most favorable rating), Moderate, or High. AR 35-14477. The RFP also stated that "[f]or any weakness identified, the evaluation shall address the [o]fferor's proposed mitigation and why that mitigation approach is or is not manageable." AR 35-14476.

### 2. *The past performance evaluation factor.*

The past performance factor assessed the government's confidence in each offeror's ability to "successfully perform the required effort," based on both the quantity and quality of their past experience. AR 35-14480 to -82. The government would consider the past

performance information included in the proposals, information obtained from government databases, and reviews from program managers, contracting officers, and other government officials responsible for prior contracts, including those officials' responses to a past performance questionnaire.  AR 35-14481; AR 123-27925.  The offerors could submit past performance information from "team members that were the prime [o]fferor, a joint venture . . . partner if the [o]fferor was organized as a [joint venture], or a major subcontractor [responsible for 10 percent or more of the contract scope]."  AR 132-27924.  The government would assign each offeror one of five confidence assessments for this factor: Substantial Confidence, Satisfactory Confidence, Limited Confidence, No Confidence, or Unknown Confidence (Neutral).  AR 35-14480.

In evaluating this factor, the government would first determine whether each contract submitted as a past performance reference met recency requirements, *i.e.*, that it was performed within the past four years.  AR 35-14481.  For each prior contract that met this requirement, the government would assign one of four relevancy ratings based on the scope, magnitude, and complexity of the work: Very Relevant, Relevant, Somewhat Relevant, or Not Relevant.  AR 35-14481 to -82.  The government would also assign one of six quality assessment ratings for each contract: Blue/Exceptional, Purple/Very Good, Green/Satisfactory, Yellow/Marginal, Red/Unsatisfactory, or Not Applicable.  AR 35-14483 to -84.  These relevancy and quality ratings would then be reviewed as a whole, in conjunction with the recency of performance, to determine the overall confidence assessment.  AR 35-14484.

### 3.  *The cost-price evaluation factor.*

Finally, the RFP stated that the cost-price factor would be evaluated based on the most probable cost as determined by the government's estimate of the "anticipated performance costs plus any fee anticipated to be awarded."  AR 35-14484.  The most probable cost estimate would be based on the reasonableness of the proposed price, the "realism" of the price in light of the offeror's understanding of the solicitation requirements, and whether the proposal was "unbalanced with respect to prices."  AR 35-14484 to -85.

The cost-price evaluation included a cost-realism assessment aided by a software program, Crystal Ball.  AR 55-18556.  Crystal Ball was specifically used to assess the realism of the proposed cost savings submitted by the offerors in response to the Innovations and Efficiencies subfactor of the technical factor.  AR 55-18556.  The team of subject matter experts assigned to this subfactor evaluated each innovation or efficiency proposed by the offerors, and then assigned a minimum, most likely, and maximum value (in percentages) to the net savings proposed.  AR 55-18556.  The Innovations and Efficiencies team then passed these values to the Cost team, which input the data to the Crystal Ball program for a statistical simulation that determined the "most realistic and obtainable net savings" for each innovation and efficiency proposed.  AR 55-18556; *see also* AR Tabs 53, 54, 57, 78, 79, 90, 111 (Crystal Ball calculations for Innovative Test and National Aerospace during the evaluation process).  In instances where an offeror did not use the government estimate of costs provided in the RFP's workload resource guide as a baseline for their cost or net savings proposal, the evaluators treated these savings— measured as the difference between the government estimate and the offeror's proposed "Day One Staffing" cost—as additional innovations and efficiencies evaluated through this method.

AR 55-18556.  This was the case for Innovative Test.  *See* AR Tab 57 (Crystal Ball calculations related to Innovative Test's "Day One Reductions").

## C. *Evaluation of Proposals and Award Decision*

The Air Force received proposals from four offerors, [***], [***], Innovative Test, and National Aerospace.  AR 132-27928.[7]  Each of the offers were considered in the competitive range for discussions.  AR 132-27928.  [***] withdrew from consideration on February 23, 2015, however, because of concerns over an organizational conflict of interest.  AR 132-27930.

The Air Force Source Selection Authority for the Test Operations and Sustainment contract was the Air Force Program Executive Office for Combat and Mission Support.  AR 132-27905.  The source selection process began with four teams of subject matter experts who evaluated the proposals for the technical, past performance, and cost-price factors.  AR 41-15871.  These teams reported their evaluation results to the Source Selection Evaluation Board ("Board"), which reviewed the results against the solicitation requirements and evaluation criteria.  AR 41-15877.  The Board then provided the results to the Source Selection Advisory Council ("Council"), which reviewed the results again for consistency and made a recommendation to the Source Selection Authority.  AR 41-15875; AR 132-27915.  The Air Force also used a Multi-Functional Independent Review Team to review the ratings and comments provided by the evaluation teams for consistency and completeness.  *See* AR Tabs 60, 81, 128 (spreadsheets from the team's reviews in December 2014, March 2015, and May 2015).

Over several months, the Air Force communicated with the offerors through six rounds of evaluation notices, in which the government requested clarification or additional information regarding the proposals and notified the offerors of weaknesses, significant weaknesses, and deficiencies noted by the evaluation teams.  *See* AR Tabs 62, 63, 68, 69, 74, 75, 83, 85, 86, 92, 113, 114.  These evaluation notices included "most probable cost adjustment[s]" to proposed innovations and efficiencies determined through the cost-realism assessment, using the Crystal Ball program.  AR 55-18556.  The offerors provided detailed responses to these evaluation notices and also had the opportunity to either engage in one-on-one discussions with the Air Force or formally submit questions, to which the Air Force responded.  *See* AR Tabs 64-67, 70-73, 76, 77, 87-89, 93, 115-17.  Based on these discussions, the offerors submitted their final proposal revisions in May 2015.  AR Tabs 95-110, 119-126.[8]

---

[7][***] was a [***] with [***] and [***] as major subcontractors.  AR 132-27928.  [***] had no partners or major subcontractors.  *Id.*  Innovative Test was a joint venture of Jacobs and PAE, with ERC, HX5, Inc., and Erica Lane Enterprises as major subcontractors.  *Id.*  National Aerospace was a joint venture of Bechtel National, Inc. ("Bechtel"), Sierra Lobo, Inc., and GP Strategies.  *Id.*

[8]The Air Force initially closed discussions on April 22, 2015, following the fifth round of evaluation notices and discussions.  *See* AR Tab 95-96 (first final proposal revision requests).  However, the Air Force reopened discussions for a sixth round of evaluation notices on May 13, 2015, and then requested that the offerors submit a second final proposal revision for any matters affected by the new discussions.  See AR Tabs 119-20 (second final proposal revision requests).

The Air Force gave the following ratings to the three remaining offerors based on the final proposal revisions:

|  | Innovative Test | National Aerospace | [***] |
|---|---|---|---|
| TECHNICAL |  |  |  |
|    Technical Operations | Blue/Outstanding Low Risk | Blue/Outstanding Low Risk | Purple/Good Low Risk |
|    Management Approach | Blue/Outstanding Moderate Risk | Blue/Outstanding Low Risk | Blue/Outstanding Low Risk |
|    Qualified Personnel | Blue/Outstanding Moderate Risk | Blue/Outstanding Low Risk | Purple/Good High Risk |
|    Innovations and Efficiencies | Green/Acceptable Moderate Risk | Green/Acceptable Low Risk | Green/Acceptable Moderate Risk |
| PAST PERFORMANCE | Substantial Confidence | Substantial Confidence | Substantial Confidence |
| COST/PRICE (Most Probable Cost) | $[***] | $1,516,101,909 | $[***] |

AR 191-70135. Aside from the difference in the most probable cost calculations, the ratings for Innovative Test and National Aerospace diverged only in the risk ratings for three of the technical subfactors: Management Approach, Qualified Personnel, and Innovations and Efficiencies. AR 191-70135. For these subfactors, Innovative Test received Moderate Risk ratings and National Aerospace received Low Risk ratings. AR 191-70135.

With regard to the Management Approach subfactor, Innovative Test was assigned a weakness because of its proposed use of "standard production units" in performance measurement. AR 132-28201 to -02; AR 133-29036. When Innovative Test's initial offer proposed reliance on standard production units, it did not define this term, which led the government to ask for a definition. AR 62-19574. The government discussed this performance measurement plan with Innovative Test in three of the evaluation notice rounds. AR 132-28201. During this correspondence, Innovative Test explained that "standard production units" are "fixed" factors, AR 72-20577, in a formula to determine "the work product actually produced for [a] test . . . [which] allows the aggregate level of efficiency and labor productivity in that subset to be measured as actual labor hours charged per [standard production unit] (work product) delivered (labor cost factor)." AR 66-19928. After receiving more details about this methodology, the Air Force remained concerned that the use of fixed standard production units would not sufficiently account for variations in labor requirements over time and between testing facilities. AR 132-28201 to -02; AR 133-29036.

With regard to the Qualified Personnel subfactor, the Air Force assigned a weakness to Innovative Test because it found there was a moderate risk of increased cost based on Innovative Test's Day One staffing plan. AR 132-28206; AR 133-29042 to -43. The Air Force determined that Innovative Test's proposed Day One savings—which were based primarily on plans to use [***]—were not sufficiently supported. AR 132-28206. As a result, the Air Force also assessed

Innovative Test a most probable cost adjustment of $[***] million as part of the cost-price factor. AR 132-28206.

As noted *supra*, where an offeror did not use the government cost estimate as a basis for its cost or net savings proposal, the Air Force treated any differences between the "Day One Staffing" cost and the government estimate as additional "innovations and efficiencies" evaluated through the Crystal Ball methodology. *See* AR 55-18556. Although the staffing cost savings were treated as innovations and efficiencies for the purposes of the Crystal Ball evaluation, some of the resulting most probable cost adjustments were considered weaknesses in the Qualified Personnel subfactor, because the Day One savings were based on the proposed staffing plan. AR 132-28206. For Innovative Test, the Air Force added "Day One" innovations and efficiencies for Overhead, FY14/15 Productivity Gains, Work Scope Accounting, Embedded Technology Management Approaches, and Innovations, because these represented areas where Innovative Test's Day One Staffing costs differed from the government estimate. *See* AR 132-28384 to -99. After Innovative Test's final proposal revision, the government agreed with the cost savings proposed for most of these areas. AR 132-28403. However, the government assigned Innovative Test most probable cost adjustments for Embedded Technology Management Approaches ($[***] million) and FY 14/15 Productivity Gains ($[***] million). AR 132-28403; *see also* AR 132-28392, -28399 (discussing the reasons for these adjustments). These two adjustments totaled the most probable cost adjustment of $[***] million ascribed as a weakness in the Qualified Personnel subfactor. AR 132-28206.

Finally, for the Innovations and Efficiencies subfactor, the Air Force assessed that Innovative Test's cost savings were overstated because the proposed "[***]" was event-driven rather than day-to-day. AR 132-28212. The government also determined that the proposed savings from various Lean Six Sigma events Innovative Test intended to hold periodically "will likely overlap [with other projects already contemplated in the government's cost estimate] and will not necessarily compound year-to-year." AR 132-28212. In addition to a Technical Risk weakness, the Air Force assessed Innovative Test an approximately $[***] million most probable cost adjustment based on its "[***]" proposal. AR 132-28375.

Based on a comparative analysis of these ratings and reviews by the evaluation teams, the Council determined that the National Aerospace proposal represented the best value to the government and recommended that the contract be awarded accordingly. AR 133-29050. On June 4, 2015, the Source Selection Authority approved this recommendation and directed the contract award to National Aerospace. AR 134-29073. The Air Force notified National Aerospace and the unsuccessful offerors of the award on June 11, 2015. AR Tabs 138, 139.

D. *GAO Protest*

After the Air Force notified Innovative Test that National Aerospace had received the contract, AR 138-29077, Innovative Test requested a debriefing from the contracting officer, which it received on June 19, 2015. AR Tab 144. Innovative Test submitted several questions following the debriefing, which the Air Force answered on June 22, 2015. AR Tabs 142, 147. Innovative Test filed a protest with GAO on June 24, 2015. AR 148-29379. Performance of the

newly awarded contract was suspended under the Competition in Contracting Act, 31 U.S.C. § 3553(d), during the pendency of the GAO protest.  AR 148-29380; AR 152-29594.

In its protest, Innovative Test challenged the Air Force's evaluation of the technical, cost-price, and past performance factors.  AR 148-29392 to -405.  Regarding the technical factor, Innovative Test asserted that the weakness it was assigned in the Management Approach subfactor for its use of standard production units for performance measurement was based on "factually incorrect" information and a misunderstanding of Innovative Test's proposal.  AR 148-29393.  Innovative Test also argued that the Air Force incorrectly determined there was a risk that its staffing plan would not lead to the proposed Day One cost savings.  AR 148-29395.  Correlatively, Innovative Test contended that the government unreasonably assigned a weakness in the Innovations and Efficiencies subfactor based on potential overlap with government programs, because the government never disclosed the full "details" of its independent cost estimate to offerors, and therefore Innovative Test could not have accounted for these programs.  AR 148-29395.[9]  And, Innovative Test argued that by assigning a weakness in the Qualified Personnel and Innovations and Efficiencies subfactors based on the related most probable cost adjustments, the government was in effect double-penalizing Innovative Test, because these adjustments were also a consideration in the cost-price factor.   AR 148-29395.

Respecting the cost-realism analysis in the cost-price factor, Innovative Test argued that the Air Force failed to "meaningfully account for [Innovative Test's] proposed innovations and efficiencies."  AR 148-29404.  Innovative Test asserted that the Air Force "mechanically compared [Innovative Test's] proposed costs to a government cost estimate," without evaluating Innovative Test's proposed cost saving initiatives in the context of its demonstrated success under the OMIMS contract.  AR 148-29404 to -05.  Innovative Test contended that this "mechanical application" led to misleading and unequal discussions that forced Innovative Test to raise its proposed price by over $[***] million to eliminate perceived weaknesses in its Technical Risk ratings.  AR 148-29405 to -06.[10]

Innovative Test contested the Air Force's evaluation of the past performance factor, asserting that it was unreasonable for Innovative Test, the "incumbent contractor" under the OMIMS contract, to be rated at the same confidence level (Substantial Confidence) as National Aerospace.  AR 148-29398.  Innovative Test argued that "Bechtel, the managing partner of the [National Aerospace] team, does not have significant current or recent experience involving test facilities similar to those at [Arnold Engineering Development Complex]."  AR 148-29398.  It

---

[9]Innovative Test also argued that by using the government cost estimate to evaluate its proposed innovations and efficiencies, the Air Force applied "unstated evaluation criteria" in violation of Federal Acquisition Regulations, 48 C.F.R. ("FAR") §§ 15.305(a), 15.308, and 15.404(d).  AR 148-29396 to -97.

[10]Innovative Test also argued that misleading discussions also caused the Air Force to evaluate Innovative Test and National Aerospace unequally, since there was no evidence that National Aerospace was similarly "forced" to drop their cost saving proposals to avoid weaknesses in Technical Risk ratings.  AR 148-29407 to -08.

asserted that the evaluation disproportionately credited GP Strategies and Sierra Lobo with relevant past performance, given the minor scope and magnitude of their work on similar contracts.  AR 148-29401 to -02.  In particular, Innovative Test noted that GP Strategies' contribution to the ATA joint venture only accounted for approximately five percent of the work under the OMIMS contract, and yet the Air Force appeared to have given GP Strategies the same amount of credit for that effort as the other ATA participants, Jacobs and PAE (which were proposed as partners in Innovative Test).  AR 148-29402.

Finally, Innovative Test asserted that, based on all its foregoing protest grounds, the Air Force's best value determination was flawed.  AR 148-29412.  It argued that the "tradeoff decision" was based on inappropriate ratings and an inaccurate most probable cost estimate.  AR 148-29412.  Innovative Test also contended that the Air Force did not adequately document or justify its decision to award the contract to National Aerospace, given that National Aerospace's most probable cost estimate was approximately $[***] million higher than Innovative Test's.  AR 148-29413 to -414.[11]

GAO issued its decision under seal on October 2, 2015.  AR Tab 183.[12]  GAO found that the Air Force's evaluations of the Qualified Personnel and Innovations and Efficiencies subfactors of the technical factor were unreasonable because the weaknesses identified for these subfactors were "cost risk[s]" rather than "technical risk[s]," and therefore should only have been accounted for within the cost-price factor evaluation.  AR 183-68856 to -60.  GAO also found that these errors caused prejudice to Innovative Test in the Air Force's overall "cost/technical tradeoff decision."  AR 183-68860.  Accordingly, GAO recommended that the Air Force "reevaluate [Innovative Test's] technical proposal risk and, based on that reevaluation, make a new source selection determination."  AR 183-68868.  GAO denied all other grounds of Innovative Test's protest, including its assertion that the evaluation of the Management Approach subfactor was unreasonable.  AR 183-68854.

E.  *The Air Force's Reevaluation of Proposals*

Following GAO's decision, the Air Force promptly undertook corrective action.  AR Tab 184; *see also* Prelim. Inj. Hr'g Tr. 16:24-25, 17:1-12 (Nov. 2, 2015), ECF No. 34 (discussing the status of the corrective action as of that date).  The reevaluation was limited to the Technical Risk ratings in the Qualified Personnel and Innovation and Efficiencies subfactors using "[a] combination of experienced and new evaluators, and newly assigned subfactor chiefs."  AR 190-69000; *see also* AR 192-70243.  The new source selection decision would be based on these reevaluated subfactors in conjunction with all other areas of the evaluation "as initially evaluated."  AR 190-69000; AR 192-70243; *see also* AR 131-27779 (showing the pre-protest

_____

[11]Innovative Test also asserted that National Aerospace possessed an "unmitigated" organizational conflict of interest.  AR 148-29408 to -11.  This issue was not raised in the protest before this court.

[12]To the court's knowledge, GAO's decision has not yet been made public in redacted form.

source selection organization), AR 191-70128 (showing the post-protest source selection organization). In effect, the Air Force's corrective action drew heavily on its prior analysis and determinations. Along those lines, four days after GAO rendered its decision, on October 6, 2015, the chair of the previous Board sent the following e-mail to the chair of the Council, commenting that "more detail" was needed to support the Air Force's analysis:

> It was mentioned yesterday within the [Source Selection Evaluation Board] during our assessment of where we stand that the [Test Operations and Sustainment contract comparative analysis report prepared by the Council] could have *more detail* provided and a stronger foundation set. I will defer to legal and contracting on their assessments. If this is the case, *now is the time to ensure the content is more robust* on those areas that are not being protested. The theme we have pushed is that the [National Aerospace] proposal was so technically superior, that it was the preferred proposal overall. The question is whether that is sufficiently captured in the [comparative analysis report]. If the consensus is no, then *now is the time for the [Council to] start building upon the foundation of the [comparative analysis report]* and not 30 days from now.

AR 184-68869 (emphasis added).

The Air Force completed its reevaluation on November 5, 2015, a month later, maintaining the award to National Aerospace. AR 185-68887. The reevaluation resulted in the following ratings for the three offerors:

|  | Innovative Test | National Aerospace | [***] |
|---|---|---|---|
| TECHNICAL |  |  |  |
| Technical Operations | Blue/Outstanding Low Risk | Blue/Outstanding Low Risk | Purple/Good Low Risk |
| Management Approach | Blue/Outstanding Moderate Risk | Blue/Outstanding Low Risk | Blue/Outstanding Low Risk |
| Qualified Personnel | Blue/Outstanding Low Risk | Blue/Outstanding Low Risk | Purple/Good Moderate Risk |
| Innovations and Efficiencies | Green/Acceptable Low Risk | Green/Acceptable Low Risk | Green/Acceptable Moderate Risk |
| PAST PERFORMANCE | Substantial Confidence | Substantial Confidence | Substantial Confidence |
| COST/PRICE (Most Probable Cost) | $[***] | $1,516,101,909 | $[***] |

AR 191-70136. The government improved Innovative Test's Technical Risk rating for the Qualified Personnel and Innovations and Efficiencies subfactors, shifting those ratings from Moderate Risk to Low Risk. AR 190-69310, -14.[13] The Air Force removed the weaknesses in

---

[13]The Air Force also improved [***]'s Technical Risk rating in the Qualified Personnel subfactor from High Risk to Moderate Risk. AR 190-69159.

these subfactors related to Innovative Test's statement of proposed cost savings, but kept one weakness in the Innovations and Efficiencies subfactor based on its proposed "[***]," stating that Innovative Test "has not proposed sufficient mitigations to address the risk of failure to adequately engage the [Innovative Test] workforce in the identification and effective deployment of continuous process improvements." AR 190-69320.

Overall, the Council concluded that "[t]he [National Aerospace] proposal provided a stronger approach to technical operations, a more effective and efficient management approach, and the most comprehensive knowledge of the qualified personnel requirements and associated challenges." AR 192-70262. The Council also noted that, given the fact that the solicitation specified that the technical and past performance factors were "significantly more important" than the cost-price factor, National Aerospace's "technically superior proposal . . . far outweighed the [***] percent cost difference between [National Aerospace's] and [Innovative Test's most probable cost], and represented the best value to the [g]overnment." AR 192-70263. The Source Selection Authority concurred with this assessment. AR 192-70264 to -66.

F. *Protest in This Court*

On October 30, 2015, while the reevaluation was underway, Innovative Test filed its protest in this court, claiming that the Air Force's corrective action was inherently arbitrary and inadequate because it would not address all the grounds raised in Innovative Test's GAO protest. Compl. at 1. Innovative Test submitted an application for a temporary restraining order and a motion for preliminary injunction on the same date. Pl.'s Mot. for Prelim. Inj., ECF No. 2; Pl.'s Appl. for TRO, ECF No. 4. After a hearing on November 2, 2015, the court denied the application for a temporary restraining order for a lack of immediate harm, and suspended action on the motion for a preliminary injunction pending completion of the corrective action. Order of Nov. 2, 2015, ECF No. 15; Order of Nov. 2, 2015, ECF No. 16. The court also granted National Aerospace's motion to intervene in the case. Order of Nov. 2, 2015, ECF No. 13.

The corrective action was completed, and, during a status conference on December 3, 2015, the court set a briefing schedule to address Innovative Test's renewed protest regarding the Air Force's corrective action, providing for the parties' cross motions for judgment on the administrative record. Scheduling Order (Dec. 3, 2015), ECF No. 41. The government filed the administrative record on December 10, 2015, ECF No. 44, and Innovative Test filed its amended complaint on December 18, 2015, ECF No. 47.[14] Innovative Test asked the court to "enter a permanent injunction directing the Air Force to appoint a new evaluation team and Source Selection Authority . . . and take corrective action that fairly and adequately addresses the evaluation flaws identified herein." Am. Compl. at 2.

In its amended complaint, Innovative Test claims that the Air Force "breached its implied duty to fairly and honestly consider [Innovative Test's] proposal," alleging that the Air Force's revaluation "was focused on preserving the original award decision." Am. Compl. ¶¶ 48-57.

---

[14]The government filed a corrected administrative record on December 21, 2015, ECF No. 48.

Innovative Test also alleges that the corrective action was inherently arbitrary and inadequate because it did not address the alleged flaws in the evaluation of the cost-price factor, which was in turn affected by the allegedly erroneous cost-realism analysis of the Innovations and Efficiencies cost savings.  Am. Compl. ¶¶ 59-153.[15]  Innovative Test further contends that the corrective action did not rectify the Air Force's "flawed evaluation" of the technical factor because there was no reevaluation of the Management Approach subfactor (GAO had denied this protest ground), and because its reevaluation of the Qualified Personnel and Innovations and Efficiencies subfactors did not go far enough to rectify the effect that the Air Force's original evaluation had on other aspects of the evaluation, including the most probable cost estimate. Am. Compl. ¶¶ 155-85.  Finally, Innovative Test argues that the reevaluation did not correct the "materially flawed" evaluation of the past performance factor, both because GP Strategies was still given "full credit" for the OMIMS contract performance, and because Innovative Test and National Aerospace received the same confidence rating, despite the fact that Innovative Test had stronger ratings overall on its references.  Am. Compl. ¶¶ 187-201.  As a result of these alleged flaws in the evaluation (and reevaluation) process, Innovative Test claims that the Air Force's best-value determination was arbitrary and unjustified, prejudicing Innovative Test from receiving the contract award.  Am. Compl. ¶¶ 203-15.

The parties' cross motions for judgment on the administrative record have been fully briefed and were addressed at a hearing on February 2, 2016.  The motions are now ready for disposition.

## JURISDICTION

Pursuant to the Tucker Act, this court has jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1), added by the Administrative Dispute Resolution Act ("ADRA"), Pub. L.

---

[15]With regard to the cost-price factor, Innovative Test's amended complaint focuses on changes the Air Force made to Innovative Test's proposed price based on the Air Force's most probable cost analysis.  Innovative Test claims that without the Air Force's flawed adjustments, its most probable cost would have been $[***] versus $[***], which would equate to a cost savings of approximately $[***] million compared to National Aerospace ($1,516,101,909), rather than the assessed savings of approximately $[***] million.  Am. Compl. ¶¶ 60-61.  The amended complaint did not explicitly reassert Innovative Test's argument before GAO that the Air Force's misleading discussions caused Innovative Test to increase their proposed price by over $[***] million to avoid lowered Technical Risk ratings, nor is this argument explicitly raised in Innovative Test's motion for judgment on the administrative record.  *See* AR 148-29405 to - 06.  Innovative Test did allude to the fact that the flawed cost-realism analysis led to misleading discussions, which in turn caused "unquestionable harm" to Innovative Test.  *See, e.g.*, Am. Compl. ¶ 82 ("The [Air Force's] robotic dependence on the inherently arbitrary Crystal Ball outputs (and its subsequent direction to [Innovative Test] to come in line with the arbitrary estimates in order to eliminate technical risk assessments) resulted in misleading discussions and unquestionable harm to [Innovative Test].").

No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996); *see also Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012).  The court thus has jurisdiction to "determine if the corrective action taken by a procuring agency as a result of a bid protest was reasonable under the circumstances."  *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 151 (2010) (quoting *Centech Grp., Inc. v. United States*, 78 Fed. Cl. 496, 506 (2007)); *see also Systems Application*, 691 F.3d at 1381 (commenting that the court can review an agency's corrective action or proposed corrective action "even when such action is not fully implemented").  Accordingly, the court has jurisdiction over the present case.

## STANDARDS FOR DECISION

The Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706, governs the court's review of an agency's contract award.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  A court may set aside an agency decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The arbitrary and capricious standard is highly deferential, *see Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and the court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

Notwithstanding this deferential standard, the court may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  An agency's decision lacks a rational basis, and is therefore arbitrary and capricious, when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43); *see also Keeton Corrs.*, 59 Fed. Cl. at 755.

## ANALYSIS

A.  *Duty to Fairly and Honestly Consider Innovative Test's Proposal During the Reevaluation*

In its motion for judgment on the administrative record, Innovative Test first argues that the government breached its implied duty to fairly and honestly consider Innovative Test's proposal during the reevaluation because the Air Force was instead "focused on preserving the original contract award."  Pl.'s Mot. at 15.  As evidence of this, Innovative Test points to the

discrepancy between the post-reevaluation source selection document, which states that National Aerospace's proposal was "*significantly* more advantageous" than Innovative Test's proposal, and the original document, which stated that National Aerospace's proposal was "*moderately* more advantageous."  Pl.'s Mot. at 15 (citing AR 134-29072 (emphasis added)).  Innovative Test argues that the wording change from "significantly" to "moderately" suggests the perceived gap between the proposals actually widened, despite the fact that Innovative Test's ratings improved on reevaluation.  Pl.'s Mot. at 15.  Innovative Test also argues that the e-mail sent by the former chair of the Board to the chair of the Council at the outset of the reevaluation establishes that the Air Force had already decided to maintain the award to National Aerospace, and was merely concerned with "beefing up" its original justification.  Pl.'s Mot. at 15-16 (citing AR 184-68869, quoted *supra*, at 12).  Innovative Test points to the revised Source Selection Decision Document as evidence that the Council and the Source Selection Authority focused on adding language to the original selection document to bolster the rationale for selecting National Aerospace rather than fairly and honestly considering the procurement decision afresh as GAO had recommended.  Pl.'s Reply Br. in Support of Pl.'s Mot. ("Pl.'s Reply") at 9-11, ECF No. 60 (citing various passages in AR Tab 192); Hr'g Tr. 16:9-19, 19:11 to 25:1 (Feb. 2, 2016), ECF No. 65.  As a result, Innovative Test asserts there was no true reevaluation within "the spirit and intent of the Competition in Contracting Act."  Pl.'s Mot. at 17.

Both the government and National Aerospace equate Innovative Test's arguments with a claim that the government acted in bad faith.  *See* Def.'s Reply Br. in Support of Def.'s Mot. ("Def.'s Reply") at 3, ECF No. 61 ("This is clearly a contention that the Air Force acted in bad faith."); *see also* Def.'s Resp. in Opp'n to Pl.'s Mot. & Def.'s Cross-Mot. for Judgment on the Admin. Record ("Def.'s Cross-Mot.") at 21, ECF 56 (citing *Bannum, Inc. v. United States*, 119 Fed. Cl. 291, 302 (2014) (stating the presumption that the government acts in good faith)), *aff'd*, 616 Fed. Appx. 420 (Fed. Cir. 2015); Def.-Intervenor's Cross-Mot. for Judgment on the Admin. Record & Resp. to Pl.'s Mot. ("Def.-Interv.'s Cross-Mot.") at 13, ECF No. 57 ("[Plaintiff's allegation regarding the reevaluation] is, in essence, an allegation of bad faith on the part of [Air Force] personnel.").  In doing so, the defendants suggest that a breach of the implied duty to fairly and honestly consider a proposal is not a cognizable separate protest ground within this court's jurisdiction.  *See* Def.'s Reply at 3-4 (arguing that one of plaintiff's cited cases, *Abcon Associates, Inc. v. United States*, 49 Fed. Cl. 678, 688 (2001), is "completely inapposite because it deals with a claim of breach of the implied duty of good faith and fair dealing . . . which only applies to post-contractual behavior.").

As a threshold matter, defendants err in their statement of the law applicable to this claim by Innovative Test.  The court has jurisdiction to consider a claim of breach of the implied duty to fairly and honestly consider a proposal in the context of a post-award bid protest.  *See Systems Application*, 691 F.3d at 1382-83 ("[T]here is an implied contract that the procurement process will be conducted fairly and honestly." (citing *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir. 1983) (en banc))); *see also J.C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503, 515-16 (2012) (rejecting the government's contention that the "implied-in-fact contract of fair and honest consideration under 28 U.S.C. § 1491(a) did not survive the passage of the Administrative Dispute Resolution Act . . . for cases in which Section 1491(b) jurisdiction exists [*i.e.*, a bid protest action]"); *Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517, 531 (2011) (interpreting text of 28 U.S.C. § 1491(b) to provide that a protester in a bid protest action can

16

bring a claim for contravention of an implied covenant of fair and honest consideration); *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 97 Fed. Cl. 96, 151-52 (2010) ("[A] protestor may challenge arbitrary and capricious conduct based upon an implied-in-fact contract to consider bids fairly . . . as part of a procurement protest in which Tucker Act jurisdiction is based upon 28 U.S.C. § 1491(b)(1)."); *cf. L-3 Commc'ns Integrated Sys., LP v. United States*, 94 Fed. Cl. 394, 398 (2010) (applying the implied-in-fact contract in addressing bid protests jurisdictionally arising under Subsection 1491(a) rather than Subsection 1491(b)). *But see Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 693 (2010) (stating that the implied contract theory was abrogated by the ADRA); *Metro Van & Storage Co. v. United States*, 92 Fed. Cl. 232, 249-50 n.7 (2010) (same). Such a claim is separate and distinct from a claim that the government acted in bad faith. Importantly, "uneven treatment goes against standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207, *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

The standard applied by the court to a claim that the government has breached its duty to fairly and honestly consider a proposal is the same "arbitrary and capricious" standard applied to other protest grounds under the APA. *See Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998) ("The ultimate standard for determining whether an unsuccessful bidder is entitled to relief on the ground that the government breached the implied-in-fact contract to consider all bids fairly and honestly is whether the government's conduct was arbitrary and capricious."); *Castle-Rose*, 99 Fed. Cl. at 531 ("To recover under the implied covenant for bids to be fairly and honestly considered, a plaintiff has to establish arbitrary and capricious action by the government." (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974))).

In this case, the record provides enough evidence to raise skepticism about the government's treatment of Innovative Test's proposal on reevaluation. In particular, the e-mail from the pre-reevaluation chair of the Board provides direct evidence of an intent at the outset of the corrective action to further justify the decision to award the contract to National Aerospace. And, the revised Source Selection Decision Document, which preserves much of the language of the original document even for the reevaluated factors, also raises the possibility that the Air Force did not truly reevaluate the proposals, but instead made revisions only insofar as to provide further justification for its award to National Aerospace. The question for the court, however, is whether these aspects of the evaluation process establish that the government's award decision was motivated by an irrational, pre-determined outcome in favor of National Aerospace, without regard to any reevaluation of Innovative Test's proposal. The court concludes that they do not.

Significantly, the Board member's e-mail advocated "ensur[ing] the content is more robust on those areas that are *not* being protested." AR 184-68869 (emphasis added). And, the Council's commentary in the revised Source Selection Decision Document included additional descriptions of National Aerospace's relative advantages in the Technical Operations and Management Approach subfactors, which were not part of the reevaluation. AR 192-70249, -252. It also included more discussion of National Aerospace's relative advantages in the Qualified Personnel and Innovations and Efficiencies subfactors, which were part of the

reevaluation, plus a more detailed explanation of the Council's rationale in the overall comparison of offerors for the technical factor.  AR 192-70255, -70257 to -58.[16]

Although the four subfactors were rated separately, they all formed the basis for the government's overall evaluation of the technical factor.  *See* AR 35-14475 ("Within the [t]echnical [f]actor, all of the subfactors are of equal importance."); AR 35-14476 (explaining that the subfactor ratings would not be "rolled up" into overall Technical or Technical Risk ratings).  As a result, the court cannot conclude that it was irrational or unreasonable for the Council or the Source Selection Authority to include in the Source Selection Document more analysis of the relative strengths and weaknesses of the offerors in these subfactors, as well as the impact that these strengths and weaknesses had on the overall cost-technical tradeoff analysis.  All of the discussion in the revised Source Selection Decision Document is reasonably supported by the evaluators' comments, as summarized by the Board, during either the original evaluations (for the subfactors not being reconsidered) or the reevaluation.  *See* AR 132-28160 to -202 (original evaluation comments for Innovative Test on the Technical Operations and Management Approach subfactors), AR 132-28408 to -56 (original evaluation comments for National Aerospace on the Technical Operations and Management Approach subfactors), AR 190-69310 to -321 (reevaluation comments for Innovative Test on the Qualified Personnel and Management Approach subfactors), AR 190-69565 to -76 (reevaluation comments for National Aerospace on the Qualified Personnel and Management Approach subfactors).  In sum, the resulting Source Selection Decision Document does not show that the government acted in contravention of applicable statutes and regulations to maintain the award to National Aerospace irrespective of the reevaluation of Innovative Test's proposal.

The court thus concludes that the Air Force's award decision on reevaluation, as reflected in the Source Selection Decision Document, is rationally based on the reevaluation itself, and was not the result of a pre-determined effort to maintain the original award to National Aerospace.  The court finds that the government did not breach its duty to fairly and honestly consider Innovative Test's proposal.

B. *Technical Evaluations*

Innovative Test advances two main arguments regarding the Air Force's evaluation of the technical factor: (1) that the reevaluation was inherently flawed because it did not address the Management Approach subfactor, and (2) the reevaluation of the Innovations and Efficiencies subfactor was improper.  Pl.'s Mot. at 45-58.[17]

---

[16]The revised Source Selection Decision Document also included expanded determinations respecting the impact of the evaluation of the technical factor on the government's cost/technical tradeoff decision.  AR 192-70262 to -63, -70266.

[17]Innovative Test also generally alleges that the reevaluation of the Qualified Personnel and Innovations and Efficiencies subfactors was "inadequate" because it "[did] not remediate the impact that its original, flawed evaluation under these subfactors . . . had on the Air Force's cost evaluation and its discussions with offerors."  Pl.'s Mot. at 53-54; *see also* Am. Compl. at ¶¶ 177-79.  Innovative Test does not elaborate on this argument, and the court will not separately

1. *Original evaluation of the Management Approach subfactor.*

Innovative Test asserts that GAO should have sustained its protest with regard to the Management Approach subfactor because of alleged flaws in the original evaluation. Pl.'s Mot. at 47-51. Alternatively, as Innovative Test would have it, even though GAO did not rule in its favor on this protest ground, the Air Force should nevertheless have included the Management Approach subfactor in the reevaluation because the Air Force was on notice of the pertinent flaws. *Id.* at 51. Innovative Test's concerns with this subfactor's evaluation focus on a weakness that the Air Force assigned to Innovative Test based on its proposed use of standard production units as a way of measuring performance at the various test sites within the Arnold Engineering Development Complex. AR 132-28201 to -02; AR 133-29036.

The standard-production-unit methodology proposed by Innovative Test was intended to allow contract management to adjust the "staffing level and workload mix" over time at the various test sites and facilities. AR 66-19928. In essence, the standard production unit provided a uniform coefficient by which the labor hours and productivity at each test site and facility would be measured as a "contract workload ratio." AR 66-19931. The Air Force ideally could then adjust the staffing at the various test sites and facilities to create the greatest manpower efficiency. AR 66-19931. According to Innovative Test, this process was used by ATA under the OMIMS contract, as well as by its constituent firms (and their predecessors) at similar sites over the past 19 years, with measureable increases in efficiency. AR 66-19928 to -29.[18]

Innovative Test argues that, by assigning it a weakness in this subfactor, the Air Force subjected Innovative Test to an "unstated evaluation criterion" because the Air Force had separately determined that Innovative Test had satisfied the "Performance Measurement" criterion. Pl.'s Mot. at 48. Innovative Test also contends that the Air Force arbitrarily rejected its mitigation strategy, including its offer to meet with the Air Force each year to re-baseline the standard production units. *Id.* at 48-50. Finally, Innovative Test argues that the Air Force could not reasonably consider the use of standard production units to be a weakness when the Air Force currently uses this performance-measurement methodology. *Id.* at 50-51.

From the beginning of the evaluation process, the Air Force raised concerns about Innovative Test's proposed performance-measurement methodology and notified Innovative Test that it was considered a weakness. In the first round of evaluation notices, the Air Force asked Innovative Test to further define the standard-production-unit methodology because it was "not clear" that it met the performance work statement's requirements. AR 62-19574. In the second round of evaluation notices, the Air Force again indicated that Innovative Test had not clearly

---

address it apart from the contentions respecting the Air Force's technical reevaluation of the cost realism and cost-price factors.

[18]In Innovative Test's final proposal, it described how the use of standard production units would take account of the varied test schedules and output of each of the 19 different types of facilities at the Arnold Engineering Development Complex. *See* AR 183-68855. Innovative Test acknowledged that the production coefficients involved had "some degree of subjectivity" even though they were "based on decades of experience." *Id.*

defined "standard production unit" or how such units "can be used to account for variation in workload." AR 68-20504.   By the third round of evaluation notices, Innovative Test had adequately defined this methodology, but the Air Force stated that the use of standard production units would "increase the risk to the [g]overnment's ability to objectively measure cost savings and changes in productivity" because of "[t]he complexity of this measurement approach . . . and the lack of specificity in its implementation." AR 74-20724.  The Air Force also stated that "[t]hese metrics are not [o]bjective as they require subjective judgments." AR 74-20724.  The evaluation notice stated that this methodology was "now classified as a '[w]eakness'" in Innovative Test's proposal, and requested that Innovative Test submit additional risk mitigation strategies.  AR 74-20724.

Although Innovative Test offered to take additional steps to address the Air Force's concerns, including meeting with the government during the contract phase-in period and on an annual basis thereafter to adjust the standard-production-unit coefficients as needed, AR 101-23073, the Air Force still considered this approach a weakness in its final evaluation, AR 132-28201 to -02.  The Air Force noted that the standard production units did not adequately account for differing labor requirements during non-operational phases of tests, especially longer tests, which under Innovative Test's methodology would "appear more productive than short tests without any real change in productivity being achieved." AR 132-28201 to -02.  In this regard, the Air Force concluded that Innovative Test had not shown how its offer to re-baseline the standard production units each year would mitigate the ongoing disparity between long and short tests of different kinds, particularly during non-operational phases.  The government has offered a plausible explanation for its decision that does not "run[] counter to the evidence before the agency." *See Alabama Aircraft*, 586 F.3d at 1375.[19]

The court also cannot accept Innovative Test's assertion that, under the Air Force's evaluation criteria, it was "bizarre[]" for Innovative Test to receive anything other than a "Low" Technical Risk rating for the Management Approach subfactor, because the Air Force had separately determined that Innovative Test met all the technical requirements (measures of merit) of the subfactor.  Pl.'s Mot. at 47-48 (citing AR 192-70250).  The Technical rating and the Technical Risk ratings for each subfactor represented separate and distinct assessments of the offerors' proposals.  The Technical rating represented "the quality of the offeror's solution for meeting the [g]overnment's requirement." AR 35-14475.  In contrast, the Technical Risk rating was derived through the "identification of weakness(es)" based on the "potential for disruption of schedule, increased costs, or degradation of performance, the need for increased [g]overnment

_____

[19]Innovative Test notes that "in its evaluation of other offerors, the Air Force recognized that the opportunity to re-baseline through bilateral discussions is an effective risk mitigation strategy that improves the offerors' ability to establish objective, meaningful performance metrics." Pl.'s Mot. at 49.  This may be so, but the question here is whether annual re-baselining of the standard-production-unit coefficients was an effective mitigation strategy for the concerns raised by the Air Force with Innovative Test's proposal.  Since neither National Aerospace nor [***] was proposing to use standard production units in its performance metrics, the fact that the Air Force determined that their "re-baselining" proposals were effective reflects different methodologies and different considerations.

oversight, or the likelihood of unsuccessful contract performance."  AR 35-14476.  Under this evaluation scheme, it was not irrational for an offeror to receive, as Innovative Test did, a Blue/Outstanding Technical rating based on the overall quality of its proposal, but a Moderate Technical Risk rating because of a weakness identified by the government that raises the *potential* for less than satisfactory performance during the contract's term.[20]  The Air Force did not apply an unstated evaluation criterion, but instead rationally analyzed the proposal for weaknesses.  Therefore, Innovative Test's assertions that the Air Force's ratings were arbitrary or that it applied an "unstated evaluation criterion" to Innovative Test's proposal are unavailing.

Similarly unpersuasive is Innovative Test's argument that it was unreasonable for the Air Force to consider the use of standard production units to be a weakness when the Air Force already employs this methodology at Arnold Engineering Development Complex.  Although Innovative Test asserts that standard production units were used for performance measurement under the OMIMS contract, AR 66-19928 to -29, it does not follow that this methodology lacks any weaknesses, or that the Air Force could not reasonably have concerns about its continued use under the new contract.  Innovative Test points to an August 2014 briefing by an Air Force officer at the complex, stating that standard production units were used in fiscal year 2013 as a "stable approach for comparison of the different facilities in [the] absence of an absolute capacity."  Pl.'s Mot. at 50-51 (citing AR 169-68777).  That officer's comment is relevant, but does not by itself show that the Air Force could not reasonably have concerns about this methodology's use.

In sum, Innovative Test has failed to show that the Air Force's original evaluation of the Management Approach subfactor was arbitrary or capricious, or that the assignment of a Moderate Technical Risk rating to Innovative Test's proposal regarding that subfactor lacked a rational basis.

2.  *Reevaluation of the Innovations and Efficiencies subfactor.*

Innovative Test contends that the Air Force's technical reevaluation of the Innovations and Efficiencies subfactor was also flawed.  Specifically, Innovative Test argues that the Air Force arbitrarily failed on reevaluation to remove a weakness it was assigned under the Innovations and Efficiencies subfactor, even though its Technical Risk rating for this subfactor was improved from Moderate to Low.  Pl.'s Mot. at 50-52.  Innovative Test also notes that National Aerospace proposed a similar "innovation" involving process improvements achieved through the Lean Six Sigma program, but was not assigned a weakness in the final evaluation, which Innovative Test asserts is "a classic case of disparate treatment."  Pl.'s Mot. at 53.

---

[20]The RFP evaluation criteria (Section M) also distinguish between "deficiencies," which are part of the Technical rating, and "weaknesses," which are part of the Technical Risk rating. AR 35-14476 to -77.  A proposal with no deficiencies would meet the subfactor's requirements, but it might still have weaknesses that could adversely affect the Technical Risk rating.  AR 35-14476 to -77.  The court accepts that the two ratings arguably should have a close correlation, but that is not the same as mandating that they should be identical.

The weakness in question is based on Innovation and Efficiency #22 proposed by Innovative Test, titled "[***]."  AR 132-28211.  Innovative Test proposed to "inject the desired cultural attributes necessary to achieve the [Arnold Engineering Development Complex's] 2024 Vision into their employees" through various training and enrichment programs.  AR 132-28211. Innovative Test also stated that these programs would lead to measureable cost savings.  AR 132-28211.  In its original evaluation, the Air Force assigned Innovative Test a weakness for this innovation based on the risk it would not achieve the asserted cost savings.  AR 132-28212. GAO found that this weakness was inappropriate because it concerned a "cost risk" rather than a "technical risk," and should only have been addressed within the cost-price factor evaluation. AR 183-68858 to -60.  On reevaluation, the Air Force still assigned Innovative Test a weakness for Innovation and Efficiency #22, but on a basis not related to cost savings.  AR 190-69320. Specifically, the Air Force determined there was a risk that the proposed *qualitative* improvement under the "[***]" would not be realized due to insufficient workforce engagement and a lack of continuous process improvements.  AR 190-69320.  Innovative Test identified these risks in its proposal, but proposed a mitigation strategy to address them; the Air Force determined that this mitigation strategy was insufficient.  AR 190-69320.

To start, Innovative Test mischaracterizes the weakness assigned to it on reevaluation as the same weakness that GAO "deemed to be 'improper.'"  Pl.'s Mot. at 51-52 (quoting AR 183-68859).  Although the weakness related to the same Innovation and Efficiency (#22), the basis for the reevaluated weakness was not the risk to achieving the proposed cost savings, which is what GAO specifically found to be improper in the original evaluation.  Rather, the Air Force determined there was a risk that the proposed efficiency would not lead to the asserted qualitative improvements in the workforce's culture.  The technical evaluation of the Innovations and Efficiencies subfactor was intended to assess both cost savings and "qualitative improvements" to the requirements in the performance work statement.  AR 35-14480. Although GAO correctly determined that under this scheme, Innovative Test was double penalized for its cost savings risks in both the technical and cost-price factors, it does not follow that a weakness assigned regarding qualitative improvement is likewise improper.

Innovative Test's own final proposal revision identified risks associated with its "[***]" proposal, including "failure to adequately engage the [Innovative Test] workforce and key stakeholders" and "failure to effectively build trust and transparency by [Innovative Test] leadership."  AR 122-26369.  Although Innovative Test proposed strategies to mitigate these risks, the Air Force found that these mitigation efforts were not sufficient.  AR 190-69320. The government also explained why it determined that the proposed series of "intermittent activities" was not sufficient to create the type of widespread cultural change that Innovative Test proposed. AR 190-69320.  Again, Innovative Test may disagree with this assessment, but it has not demonstrated that the Air Force lacked a rational basis for this decision.

Innovative Test's assertion that the Air Force engaged in disparate treatment with regard to this weakness is similarly unpersuasive.  In essence, Innovative Test is arguing that because both it and National Aerospace mentioned Lean Six Sigma in their proposals, the government should have given them equivalent risk assessments for the Innovations and Efficiencies subfactor.  This argument ignores the fact that although Innovative Test and National Aerospace both proposed to use "Lean Six Sigma" to create process improvements, their specific proposals

in this regard differ.  Innovative Test's proposal, as part of the "[***]" innovation, mentions "Lean, 5S, and Six Sigma" as examples of "industry proven tools" that it would use in its "Structured Continuous Process Improvement" program.  AR 122-26367.  By contrast, National Aerospace proposed an innovation titled "Implement Lean Six Sigma" that was focused exclusively on introducing this program to the workforce, as an initiative to support the complex's "2024 Vision."  AR Tab 126.  Innovative Test's "[***]" proposal mentioned implementing the Lean Six Sigma program as an available option rather than as a focus, and the government appropriately evaluated it in conjunction with the other programs Innovative Test cited.  Accordingly, the government's assignment of a weakness to Innovative Test's overall proposed innovation does not constitute disparate treatment.[21]

In sum, Innovative Test has failed to show that the Air Force's technical reevaluation of the Innovations and Efficiencies subfactor was arbitrary or capricious.

## C.  *Cost-Price Factor Evaluations*

Innovative Test next raises several protest grounds related to the Air Force's evaluation of the cost-price factor, and specifically its cost-realism analysis of the Innovations and Efficiencies subfactor, which in turn affected the Air Force's most probable cost determination. Innovative Test's protests in this regard focus on two main arguments: (1) the Air Force's cost-realism methodology was generally inappropriate and unfairly implemented, and (2) the methodology was particularly prejudicial to Innovative Test because its Day One cost savings were evaluated as separate innovations and efficiencies.  Pl.'s Mot. at 18.  As Innovative Test would have it, its most probable cost should have been approximately $[***] million lower than the Air Force's assessment, which would have widened the gap between it and National Aerospace for the cost-price factor.  *Id.* at 18-19.

In applying the "arbitrary and capricious" standard generally pertinent to a bid protest, the court has held that "cost-realism determinations are within an agency's 'sound discretion and expertise,' [and] the [c]ourt will not overturn a cost[-]realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision."  *A-T Solutions, Inc. v. United States*, 122 Fed. Cl. 170, 180 (2015) (quoting *CTA Inc. v. United States*, 44 Fed. Cl. 684, 693 (1999)).  The cost-realism analysis "need not have been performed with 'impeccable rigor,'" but it "must reflect that the agency considered the information available and did not make 'irrational assumptions or critical miscalculations.'"  *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000)).  In a best value procurement such as this one, the contracting officer inherently exercises significant discretion.  *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

---

[21]Notably, although the weakness assigned to Innovative Test in the original evaluation mentions its use of Lean Six Sigma techniques in connection with assigning a risk of not achieving the asserted cost savings, AR 132-28212, the Lean Six Sigma program is not specifically mentioned in the weakness assigned during the reevaluation, AR 190-69320.

1.   *The Air Force's implementation of its cost-realism methodology.*

Innovative Test argues that the team evaluating the Innovations and Efficiencies cost savings proposals ("Innovations and Efficiencies team"), was inadequately trained to evaluate the risk associated with achieving those cost savings, which essentially rendered meaningless the statistical analysis performed through the Crystal Ball Software.  Pl.'s Mot. at 19-25.[22]  In particular, Innovative Test asserts that the Innovations and Efficiencies team failed meaningfully to analyze the labor hour/workforce reductions proposed by the offerors, including those based on negotiating flexible union work rules, to ensure that the reductions were realistic.  *Id.* at 25-36.[23]

As previously discussed, the Innovations and Efficiencies team evaluated each cost savings proposal and assigned a minimum, most likely, and maximum value (in percentages) to the net savings proposed.  AR 55-18556.  For Innovative Test, the innovations and efficiencies evaluation included areas where there were differences between its proposed Day One staffing costs and the government cost estimate, a step the evaluation team took because Innovative Test did not use the government estimate as a baseline.  AR 55-18556, 132-28348; *see also* AR Tab

---

[22]Both Innovative Test and National Aerospace submitted expert declarations to address the contention that the members of the Innovations and Efficiencies team applied different standards for assessing risk associated with the cost savings proposals.  *See* Def.-Interv.'s Mot. Ex. A (Declaration of Greg S. Bingham), ECF No. 57-1; Pl.'s Reply Ex. A (Declaration of Matthew Franz), ECF No. 60-1; Def.-Interv.'s Reply Ex. A (Supplemental Declaration of Greg S. Bingham), ECF No. 62-1.  The court has not considered these supplemental declarations in this opinion because they are not essential to understanding the relevant facts that are already part of the administrative record in this case. *See FirstLine Transp. Sec., Inc. v. United States*, 116 Fed. Cl. 324, 326 (2014) ("Supplementation of the administrative record should be limited to cases in which the omission of extra-record evidence would preclude effective judicial review." (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009))); *see also Bannum, Inc. v. United States*, 89 Fed. Cl. 184, 189 (2009) (allowing supplementation of the administrative record when the additional documents would allow the court to have a "complete understanding" of issue raised in the bid protest).

[23]Innovative Test raised an additional argument that the Air Force erred in its evaluation of the [***] innovation because it incorrectly evaluated the proposal based on a [***] percent labor efficiency factor over the life of the contract, rather than a [***] percent efficiency factor. Pl.'s Mot. at 44-45.  In its cross-motion, the government noted that Innovative Test's final proposal revision used both the [***] percent and [***] percent figures when describing its proposed labor efficiency gains, and it was therefore reasonable for the government to base its evaluation on the higher figure.  Def.'s Cross-Mot. at 44.  Innovative Test did not address this issue in its reply brief, nor did it raise the argument at the hearing.  And, Innovative Test raised and abandoned this argument at GAO as well.  *See* AR Tab 183.  To the extent that Innovative Test has not abandoned this argument, the court rejects it on the basis that it was reasonable for the government to have conducted its evaluation as it did based on the conflicting information presented in Innovative Test's final proposal revision.

57 (Crystal Ball calculations related to Innovative Test's "Day One Reductions"). The Innovations and Efficiencies team met initially to discuss the "reasonable range" for the net savings proposed by each offeror, as well as the risks associated with each innovation or efficiency proposed. AR 55-18556. After this discussion, however, the team members individually evaluated each cost savings proposal and assigned their own minimum, most likely, and maximum value percentages. AR 55-18556. These percentages were then entered into the Crystal Ball program, which created a "most realistic net savings" for each innovation or efficiency. AR 55-18556; *see also* AR Tabs 53, 54, 57, 78, 79, 90, 111 (setting out the Crystal Ball worksheets for Innovative Test and National Aerospace showing the percentages assigned by each team member, the Crystal Ball savings assessment, and the associated most probable cost adjustment).

When the Innovations and Efficiencies team assigned a deficiency or weakness to a certain innovation or efficiency, it worked with the Cost team to create an evaluation notice to the pertinent offeror that included the current most probable cost adjustment. AR 55-18556; *see also, e.g.*, AR 132-28348 to -99 (summarizing the evaluation notices sent to Innovative Test and the rationale for the most probable cost adjustments). The offerors had an opportunity to either provide additional information to the evaluation team to address their risk concerns or adjust their cost savings proposal to match the calculated most probable cost adjustment. For its final proposal revision, Innovative Test received most probable cost adjustments for two Day One cost savings "efficiencies": FY14/15 Productivity Gains ($[***] million) and Embedded Technical and Management Approaches ($[***] million). AR 132-28402. It also received a most probable cost adjustment of $[***] million for its "[***]" innovation. AR 132-28402. For all other innovations and efficiencies, Innovative Test either changed its proposed cost savings to match the most probable cost adjustment or resolved the government's concerns through its responses to the evaluation notices.

Based on the record of the cost-realism evaluation process, Innovative Test's assertions that the Innovations and Efficiencies team was inadequately trained and that their cost-realism inputs were "meaningless" are unpersuasive. Innovative Test contends that the record lacks evidence that the team received "any guidance on how to perform an adequate review and evaluation" of the cost savings proposals, any instructions on "supporting documentation offerors could supply to substantiate their . . . cost savings estimates," or any criteria "to account in a consistent fashion for [assessed] risk." Pl.'s Mot. at 20. Innovative Test points to disparities in the percentages assigned by the team members to certain innovations and efficiencies as evidence that their evaluations were "arbitrary." *Id.* at 20-21. The description of the cost-realism evaluation process in the record and the detailed rationale provided by the team for their evaluations belie Innovative Test's assertions, but even if the contentions were supported, Innovative Test's argument would fail as a matter of law. In the past, judges of this court have looked to whether "bad faith, conflict of interest, or bias" adversely affected the composition of an evaluation team or the expertise of its members. *Software Eng'g Servs., Corp. v. United States*, 85 Fed. Cl. 547, 557 (2009); *see also Laerdal Med. Corp. v. United States*, 111 Fed. Cl. 783, 796 (2013) (applying this standard); *Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 587 (2010) (same). Although Innovative Test questions the level of "guidance" given to the team and not directly the team members' "expertise," a considerable amount of deference applies to the agency's judgment in conducting a cost-realism analysis. *See Galen Med. Assocs.*, 369

F.3d at 1330.  In short, in the absence of evidence that the team members were inept, biased, or acted in bad faith, the court will accept the composition and organization of the evaluation team.

Innovative Test has similarly failed to show that the Air Force's cost-realism analysis of the proposed labor hour/workforce reductions lacked a rational basis.  Innovative Test claims that the Air Force did not evaluate all of the "specific elements" of the offerors' proposed cost savings, as required by FAR § 15.404-1, because it did not explicitly assess how the proposed reductions in labor hours within each innovation/efficiency would affect the offerors' ability to meet the workload requirements.  Pl.'s Mot. at 25.  In other words, Innovative Test contends that the Innovations and Efficiencies team only looked at whether the innovation/efficiency could realistically lead to the proposed workforce reduction, and not whether the workforce remaining after the reduction realistically could still meet the Air Force's workload requirements.  *Id.* at 25-27.  Innovative Test again argues that the record lacks evidence that the evaluators considered the impact that the workforce reductions would have on "the remaining workforce's ability to perform the contract work."  *Id.* at 26.  Although Innovative Test explains a hypothetical situation in which an offeror could gain an advantage by proposing unrealistic staffing reductions, *id.* at 27, it has not shown that this situation occurred here.  The government points out in its cross-motion that the record reflects instances in which the evaluation team commented on whether the offerors' proposed reductions would result in inadequate staffing levels, which contradicts Innovative Test's assertion that the record is "devoid" of such evidence. Def.'s Cross-Mot. at 33 (citing numerous pages from the evaluators' worksheets in AR Tab 78).  As a result, Innovative Test has not established that the evaluation team "failed to consider an important aspect of the problem."  *Alabama Aircraft*, 586 F.3d at 1375; *see also Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 260 (2015) (commenting that "the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion").

With regard to proposed union craft-workforce efficiencies as a result of union negotiations, Innovative Test separately alleges that the team's evaluation of labor-hour workforce reductions was arbitrary and unfair.  Innovative Test notes that the Air Force found National Aerospace's proposal of [***] employee reductions to be realistic, but only found [***] reductions to be realistic for Innovative Test, despite the fact that both offerors had comparable risk assessments.  *Id.* at 28-31.  The government offers three explanations for this discrepancy. First, and most importantly, although both offerors proposed to achieve workforce reductions and cost savings through negotiated collective bargaining agreements, the details of their proposed bargaining approaches were not equivalent.  Def.'s Cross-Mot. at 36-37 (comparing Innovative Test's proposed posture, described at AR 122-26323, with National Aerospace's approach, described at AR 126-27472).  Second, the evaluators determined that National Aerospace demonstrated superior experience with regard to negotiating such a collective bargaining agreement.  Def.'s Cross-Mot. at 36 (citing evaluator comments at AR 79-21088, -21106, -21112).  Finally, the government noted that the two offerors were not starting from the same place in terms of workforce reductions, since National Aerospace's proposal was based on the staffing levels in the government cost estimate, whereas Innovative Test's proposal used its own Day One staffing levels as a baseline.  Def.'s Cross-Mot. at 37 (citing AR 123-26620, -26431).  Considering these circumstances, the court concludes that although the offerors' two proposals may have been similar, the evaluators could have reasonably found that workforce

reductions were more realistic under one proposal rather than the other.  Therefore, Innovative Test has failed to establish that the Air Force's evaluation in this regard lacked a rational basis.

### 2.  *Specific cost-realism methodology related to Day One cost savings.*

Innovative Test further argues that the Air Force's disparate approach to evaluating proposed Day One cost savings, based on whether the offeror used the government's cost estimate as the basis for its proposal, caused undue prejudice to Innovative Test.  Pl.'s Mot. at 39-44.  Innovative Test contends that the Air Force did not adequately take into account the different measures used by the offerors regarding reductions.  It asserts that the Air Force irrationally accepted National Aerospace's proposed Day One workforce reductions, which represented an [***] percent *employee* reduction from the government baseline, but did not accept Innovative Test's proposed reduction in labor hours, which represented a [***] percent reduction in *labor hours* from the government baseline.  *Id.* at 39-40.  Because the Air Force determined Innovative Test's proposed reductions were unrealistic, it adjusted Innovative Test's most probable cost by $[***] million (the combined adjustments for the FY14/15 Productivity Gains and Embedded Technical and Management Approaches "efficiencies").  AR 190-69512. As previously discussed, Innovative Test's proposals for workforce reductions did not use the government's cost estimate as a baseline.  AR 55-18556, 132-28348.  As a result, any workforce reductions or cost savings that were associated with a difference between the government cost estimate and Innovative Test's Day One staffing level were evaluated as separate innovations and efficiencies. *See, e.g.*, AR Tab 57 (Crystal Ball calculations related to Innovative Test's "Day One Reductions").  By contrast, National Aerospace spread its proposed workforce reductions across the Innovations and Efficiencies subfactor.  Def.'s Cross-Mot. at 42 (citing AR Tab 54, Crystal Ball calculations of National Aerospace's enumerated reductions).  Despite the differing format, these proposals were considered by the evaluation team using the same cost-realism methodology.  The fact that the government found that National Aerospace's proposed reductions were realistic, but found that certain reductions proposed by Innovative Test were not realistic, is not in itself evidence of unequal treatment or an arbitrary decision on the part of the government.  Notably, the government provided a detailed description of its discussions with Innovative Test regarding the proposed Day One reductions and its rationale for making certain most probable cost adjustments to the final proposal revision.  AR 132-28384 to -99. Accordingly, Innovative Test has failed to demonstrate that the government's evaluation of its Day One cost savings lacked a rational basis.[24]

---

[24]For similar reasons, the court rejects Innovative Test's argument that the Air Force improperly failed to increase Innovative Test's proposed cost savings in other innovations and efficiencies when it adjusted Innovative Test's most probable cost based on its proposed Day One savings.  Pl.'s Mot. at 42-43.  Innovative Test was on notice throughout the evaluation process that its Day One cost savings were being evaluated as separate innovations and efficiencies and that the Air Force had concerns about these proposed cost savings. *See* AR 132-28384 to -99 (describing the evaluation notices and adjustments related to the Day One cost savings).  Accordingly, Innovative Test had ample opportunity to adjust either its Day One staffing levels or its other cost savings to account for these concerns.  In any event, Innovative Test concedes that any adjustment to cost savings for its other innovations and efficiencies would only amount to approximately $[***] million, which in the context of an approximately $1.5

Finally, Innovative Test argues that during the course of its discussions with offerors, the Air Force unfairly "forced" Innovative Test to reduce its proposed Day One cost savings by approximately $[***] million to avoid being assessed a technical risk in the Innovations and Efficiencies subfactor. Pl.'s Mot. at 36-39. This argument relates specifically to the Day One "Innovations" adjustment that the Air Force made to Innovative Test's proposal because its Day One cost savings differed from the government cost estimate. During the evaluation notice process, the Air Force raised concerns that Innovative Test was "double count[ing]" its cost savings in both the innovations and efficiencies related to workforce reductions and in its Day One cost savings plan. AR 190-69498. In its initial responses to the evaluation notices, Innovative Test assured the Air Force that its proposed innovations and efficiencies reflected cost savings in addition to the workforce reductions in its Day One staffing plan. *See, e.g.*, AR 88-21194. However, in its final proposal revision, Innovative Test chose to adjust its cost model to align with the government assessment. AR 123-26618 (stating that Innovative Test made this change "to prevent double counting of savings and to mitigate for potential interaction between related innovations"), AR 88-21194 to -95 (response to the Round 4 evaluation notice, stating that Innovative Test intended to make this change in its final proposal revision). The record shows that although Innovative Test disagreed with the Air Force as to whether there was double counting in its cost-savings proposals, Innovative Test ultimately acknowledged this risk and adjusted its final proposal accordingly. There is no evidence this change was the result of coercion on the part of the government; indeed, Innovative Test was free to make any adjustment to its cost-savings proposals, or none at all, based on its assessment of the validity of the Air Force's concerns. Since Innovative Test voluntarily made this change, and did so in a way that acknowledged a risk of double counting, the court cannot find that the Air Force's actions were in any way improper. *See Academy Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 459 (2009) (concurring with an advisory opinion by GAO that a firm's decision to adjust prices as a result of discussions with the agency "reflects the exercise of the firm's own business judgment, not improper conduct by the agency" (quoting *Academy Facilities Mgmt.*, B-401094.3, Advisory Opinion, at 6 (Comp. Gen. May 21, 2009))).

In sum, Innovative Test has failed to establish that the Air Force's cost-realism evaluations lacked a rational basis or were improperly prejudicial to Innovative Test's cost savings proposals or most probable cost assessment.

## D. *Past Performance Evaluations*

Finally, Innovative Test asserts that the Air Force's original evaluation with regard to past performance was flawed for two reasons: (1) the Air Force arbitrarily gave the same credit to Innovative Test and National Aerospace for performance under the OMIMS contract, even though National Aerospace's joint venture partner, GP Strategies, performed a much smaller percentage of the work than Innovative Test's constituent partners, and (2) the Air Force's assignment of the same overall past performance confidence assessment (Substantial) to

---

billion contract award is insignificant. See Pl.'s Mot. at 44 n.12 (acknowledging that the $[***] million "error" could be viewed as non-prejudicial, but asserting it is nevertheless one of many errors in the evaluation).

Innovative Test and National Aerospace was unreasonable based on the individual ratings within that factor.

"In reviewing an agency's rating of past performance, this court should focus on whether 'the evaluation was reasonable, consistent with the stated evaluation criteria[,] and compli[ant] with the relevant statutory and regulatory requirements.'" *RISC Mgmt. Joint Venture v. United States*, 69 Fed. Cl. 624, 634 (2006) (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 659 (2002)). Agencies are given "broad discretion" in evaluating past performance information, including the extent to which a prior contract is considered "relevant." *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 910-11 (Fed. Cir. 2013) (citing *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010) ("At the outset, it is important to note that what does or does not constitute 'relevant' past performance falls within the [Source Selection Authority's] considered discretion.")).

Respecting the Air Force's evaluation of GP Strategies' past performance reference as part of National Aerospace's overall past performance rating, the government explained that for many of the offerors' past performance references it was "virtually impossible to segregate the work performed by the individual team members" because they were "integrated into a seamless or 'badgeless' teammate environment." Def.'s Cross-Mot. at 53 (quoting, in part, a past performance reference from Kennedy Space Center). Accordingly, the Air Force decided "that the best way to treat these efforts equitably was to consider each member of the joint venture or integrated team as performing the whole effort." *Id.* Innovative Test asserts that this decision was contrary to the terms of the solicitation because the RFP stated that "*[i]n determining relevancy* for individual contracts, *consideration will be given to the effort, or portion of the effort, being proposed* by the [o]fferor, teaming partner, or subcontract whose contract is being reviewed and evaluated." AR 35-14589 (emphasis added); *see also* Pl.'s Mot. at 55 (quoting a portion of this statement).

As Innovative Test would have it, the pertinent question becomes whether the Air Force adhered to its indication in the RFP that it would evaluate the "portion of the effort" performed by the teaming partner in the *prior* contract. Pl.'s Mot. at 55. Nonetheless, the Air Force's statement in the RFP seemingly signaled that it would consider the portion of the effort ascribed to the teaming partner in the *current* proposal (*i.e.*, "being proposed" for the Test Operations and Sustainment contract). In other words, a teaming partner's past performance might be considered more or less relevant based on that teaming partner's expected contribution to the work being proposed under the new contract. The Air Force's statement in the RFP accordingly is ambiguous and does not by itself preclude the Air Force from giving GP Strategies "full credit" for its performance under the OMIMS contract.

Innovative Test claims that GP Strategies performed only 5 percent of the total work under the OMIMS contract, relying in part on the fact that this percentage reflected that firm's relative ownership in the ATA joint venture. Pl.'s Mot. at 54-55. The government and National Aerospace respond that the ownership percentage does not necessarily indicate the amount of work being performed by GP Strategies. Def.'s Cross-Mot. at 53-54; Def.-Interv.'s Cross-Mot. at 59-60. The defendants also note that the OMIMS contract was a larger effort than the Test Operations and Sustainment contract presently being awarded, and therefore even a 5 percent

contribution to the OMIMS effort could reasonably be considered relevant.  Def.-Interv.'s Cross-Mot. at 60.

It appears that the Air Force did not attempt, through the evaluation notice process, to determine with more precision what type or extent of work was performed by GP Strategies under the OMIMS contract, nor did it do so for Jacobs or PAE.  *See* Hr'g Tr. at 45:5-9 (Feb. 2, 2016).  And, the record at least suggests that GP Strategies' role in the OMIMS contract was merely to provide training and run a management boot camp.  Hr'g Tr. 45:12-13 (Feb. 2, 2016); AR 108-24856, -61.  The Air Force's decision to give National Aerospace full credit for GP Strategies' work on the OMIMS contract thus is poorly supported by the record.  Nonetheless, GP Strategies' participation in the OMIMS contract was only one of eleven past performance references submitted by National Aerospace.  AR 190-69680.[25]  It does not follow that the Air Force's decision to give the firm "full credit" for the OMIMS contract skewed the past performance rating in National Aerospace's favor.[26]  The record shows that excluding the rating for GP Strategies, the majority of National Aerospace's past performance quality ratings were Exceptional or Very Good, and a similar majority of references were either Very Relevant or Relevant for all the subfactors.  AR 190-69680.  The same was true for Innovative Test, although a larger percentage of its quality ratings were Exceptional versus Very Good.  AR 190-69437.  In short, Innovative Test had better past performance ratings.  But, the Air Force explained in detail its rationale for awarding both offerors a "Substantial" performance confidence rating.  AR 190-69321 to -438, -69576 to -681.  Although the court would have assigned Innovative Test a greater strength for its past performance than National Aerospace, and it questions how the Air Force could have determined that there was "no meaningful difference" in the offerors' past performance ratings, AR 186-68915, the Air Force's past performance ratings are not so bereft of rational explanation and support in the record that the Air Force's award decision should be overturned, given the other considerations that pertained to that ultimate decision.[27]

---

[25]National Aerospace submitted a total of eight past performance references, including three for Bechtel and one for GP Strategies.  *See* AR 183-68861.  The Air Force's evaluation team identified three additional Bechtel contracts as relevant and considered them as well.  *See id*.

[26]The court acknowledges that GP Strategies reference appeared to have been the strongest of National Aerospace's past performance references, since it was the only reference to receive four Very Relevant and one Relevant ratings (in additional to all Exceptional quality ratings).  AR 190-69680.  It was also the only National Aerospace reference to receive a Very Relevant rating for the Technical Operations subfactor.  AR 190-69680.

[27]Because this court has found that the Air Force's evaluations with regard to the technical and cost-price factors were not arbitrary and capricious, it need not address Innovative Test's argument that the Air Force's best-value determination was flawed by the alleged errors in the evaluation process.  *See* Pl.'s Mot. at 58-59.  To the extent that Innovative Test argues that the Air Force did not sufficiently justify its best-value decision, the court disagrees.  In the post-reevaluation source selection decision document, both the Council and the Source Selection Authority provided a detailed justification for their recommendation and decision, respectively, to award the contract to National Aerospace based on its "technically superior proposal."  AR 192-70262 to -66.  "It is well-established that contracting officers have a great deal of discretion

## CONCLUSION

For the reasons stated, Innovative Test's motion for judgment on the administrative record is DENIED.  The government's and National Aerospace's cross-motions for judgment on the administrative record are GRANTED.  The clerk is directed to issue final judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

in making contract award decisions, particularly when . . . the contract is to be awarded to the [offeror] that will provide the agency with the best value." *Banknote Corp. of America v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004) (citing *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir. 1996); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 958-59 (Fed. Cir. 1993)).  Although the court recognizes, as Innovative Test points out, Pl.'s Mot. at 59, that the Source Selection Authority must do more than "parrot back the strengths and weaknesses of the competing proposals" and make "[c]onclusory statements devoid of any substantive content," *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 496-97 (2008), that is not the situation here.  Particularly as here where the solicitation stated that non-cost-price factors would be significantly more important than cost-price, the Air Force provided sufficient justification for its decision.